UNITED STATES of America, Plaintiff–Appellee,

v.

Dean Harvey HICKS, Defendant–Appellant.

No. 92–50127.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 1993.

Decided June 28, 1993.

---

Harriet L. Hawkins, Deputy Federal Public Defender, Los Angeles, CA, for defendant-appellant.

George B. Newhouse, Jr., Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: HUG, SKOPIL, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We consider sentencing issues raised by the person responsible for launching mortar

attacks and planting car bombs designed to damage four government buildings in three California cities between 1987 and 1991.

I

As part of an ongoing effort to disrupt the functioning of the Internal Revenue Service, Dean Harvey Hicks initiated a series of attacks against IRS buildings throughout California. The first occurred on March 2, 1987, when Hicks launched mortars at an IRS building in Laguna Beach, California. Fortunately, because of a design flaw, no shells exploded, and no one was hurt.

The second attack occurred in September 1988. This time, Hicks planted a car bomb in the subterranean parking garage of a high rise building containing an IRS office on Olympic Boulevard, a busy commercial street in a densely populated area of Los Angeles. The car contained several different types of explosives, including a water heater core filled with a volatile mixture of ammonium nitrate and fuel oil. The trunk of the car housed containers of ammonia and bleach that, if ignited, would have emitted a toxic cloud. According to government investigators, the car was booby-trapped with an "anti-personnel" device that was designed to detonate if anyone attempted to move the car. Luckily, only one of the pipe bombs in the car exploded, and damage was limited to the car itself.

Soon after the incident, Hicks sent a letter to City National Bank (which had a sign on the top of the Olympic Boulevard building and thus appeared to be the owner) containing details about the bombing that could only have been known to a participant. In the letter, which purported to be from a group called "Up the IRS, Inc.," Hicks warned the occupants of the building that future bomb attacks against the IRS office were planned.

The following year, Hicks stepped up the severity of his attack against the IRS. On February 19, 1990, Hicks parked a pickup truck alongside the Olympic Boulevard building. The truck was laden with approximately 2,000 pounds of ammonium nitrate and fuel oil in fifty-five gallon drums, along with mortars that, according to Hicks, were "in-tended to break some windows." An elaborate timing mechanism set off the device three days later at 1:30 a.m., launching several mortars which struck the IRS offices on the fifth floor of the building. The truck then caught fire, and the ammonium nitrate and fuel oil began to burn. The fire department arrived and extinguished the fire before the bomb had a chance to explode. Twenty square blocks of the surrounding residential area had to be evacuated.

Hicks again sent letters from Up the IRS, Inc. claiming responsibility for the incident, this time to a local newspaper along with City National Bank. The letters again threatened future attacks against the IRS.

The final attack occurred on April 1, 1991, when Hicks launched a mortar attack against the IRS Service Center in Fresno, California. He fired thirteen shells, five of which exploded, causing moderate damage to the facility and to several parked cars. A letter from Up the IRS, Inc. claiming responsibility was sent to the *Fresno Bee*.

On July 24, 1991, a federal grand jury in the Central District of California returned an eighteen-count indictment ("Los Angeles indictment") against Hicks, charging him with several offenses in connection with the Laguna Beach and Los Angeles incidents. On July 25, 1991, a grand jury in the Eastern District of California similarly returned a two-count indictment ("Fresno indictment") against him, with charges related to the Fresno incidents. The Fresno case was transferred to Los Angeles pursuant to Federal Rule of Criminal Procedure 20. Hicks pleaded guilty to four counts of the Los Angeles indictment: three counts of damaging or attempting to damage a building used by the United States by means of an explosive device in violation of 18 U.S.C. § 844(f), and one count of endeavoring to intimidate and impede employees of the IRS from carrying out their duties by means of a threatening communication in violation of 26 U.S.C. § 7212. He also pleaded guilty to one count of violating 18 U.S.C. § 844(f) on the Fresno indictment.

## II

■ Because the written judgment in this case is inconsistent with the district court's oral pronouncement of the sentence, we must first determine which controls. In its oral decision, the court sentenced Hicks to ten years on Count 1 of the Central District of California indictment ("Count 1 of the Los Angeles indictment"), a pre-Guidelines count, and ten years each to Counts 6 and 11. The court specified that the terms imposed on Counts 6 and 11 were to run consecutively with Count 1 but concurrently with each other. The court also sentenced Hicks to ten years on Count 1 of the Eastern District of California indictment, which was transferred pursuant to Rule 20 ("Count 1 of the Fresno indictment"). The court specified that the term imposed on Count 1 of the Fresno indictment was to run concurrently with Count 1 from the Los Angeles indictment. Upon request from Hicks' counsel, the court clarified that the term imposed on Count 1 of the Fresno indictment was to run *concurrently* with those imposed on Counts 6 and 11. Thus, the court sentenced Hicks to a total of twenty years in prison.

In its written Judgment and Probation/Commitment Order, however, the court stated that the ten-year term imposed on Count 1 of the Fresno indictment was to run consecutive to *the entire sentence* imposed on the Los Angeles indictment. This would amount to a thirty-year sentence.

"In cases where there is a direct conflict between an unambiguous oral pronouncement of sentence and the written judgment and commitment, this [c]ourt has uniformly held that the oral pronouncement, as correctly reported, must control. The only sentence that is legally cognizable is the actual oral pronouncement in the presence of the defendant." *United States v. Munoz–Dela Rosa,* 495 F.2d 253, 256 (9th Cir.1974). We remand so that the district court can make the writ-

---

1. Count 1 of the Los Angeles indictment is a pre-Guidelines count. Thus, the ten-year sentence imposed for it is not considered as part of the departure.

2. The reasons given in the written judgment and commitment order differ slightly from those in the oral decision. In the written order, the court

ten judgment consistent with the oral pronouncement. For purposes of this appeal, we consider the sentence imposed to be the twenty-year term announced in open court.

## III

We next consider whether the district court properly departed from the Guidelines range. Application of the Sentencing Guidelines to Counts 6, 11, and 18 of the Los Angeles indictment and Count 1 of the Fresno indictment yielded a Guidelines range of 63 to 78 months. The district court sentenced Hicks to a total sentence of ten years on these counts—an upward departure of 42 months.[1] Hicks argues that the departure was improper.

■ In reviewing whether the departure was proper, we must apply the three-part test of *United States v. Lira–Barraza,* 941 F.2d 745, 746–47 (9th Cir.1991) (en banc). First, we must determine whether the district court had the legal authority to depart. A district court may depart upward from the applicable Guidelines range only if it identifies an aggravating circumstance "that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *Id.* at 746. Second, we must review for clear error the factual findings in support of the aggravating circumstance identified by the district court as a basis for departure. Finally, we must review the reasonableness of the extent of the district court's departure "in light of the structure, standards and policies of the Act and the Guidelines." *Id.* at 746–47. The district court must explain the reasoning for the degree of departure in sufficiently specific language to allow meaningful review. *Id.* at 751.

■ Here, the district court did not expressly identify the aggravating factors that formed the basis of its decision to depart.[2]

gives as reasons for departure "the enormity of the offense, the careful and calculated planning of the plans, over an extended period of time." However, we must consider the reasons articulated in the presence of the defendant over those in the written judgment. Section 3553(c) of the United States Code provides:

However, the court placed great emphasis at sentencing on the terroristic nature of Hicks' behavior. According to the court:

I think that this is a political case in the sense of the protest that Mr. Hicks was making against the IRS.... [H]e does not have the right to conduct a reign of terror as he did in this fashion.

Comparing Hicks' conduct to the behavior of the IRA and other terrorist groups, the court continued:

There are differences of degree. There are differences of scope. But in the final analysis, the conduct of all of these parties is political in nature. They are registering a protest and they decided to register their protest by means of terrorist activity. And that's precisely what Hicks has done here.

For five years he has stalked the IRS, placed his bombs at power poles placed his mortars so they're calculated to damage or destroy the facilities in which employees of the IRS worked. And doing that with perhaps not the intent to specifically injure individuals, but with the intent certainly that if individuals were injured or killed that those would be the fortunes of war, the unfortunate results of their having been in the wrong place at the wrong time. And therefore, they're sacrificed to Mr. Hicks' political aims.

It is clear from the prominence of this discussion in the court's oral decision that terrorism was at least one of the court's grounds for departure. To a lesser extent, the court seemed also to rely on the potential destructiveness of Hicks' activities as grounds for departure.

Both the terroristic nature of a defendant's conduct and the potential for great destruction are appropriate grounds for departure. The Sentencing Commission specifically identified terrorism as one factor that the Commission has not been able to take into ac-

count fully in formulating the Guidelines. U.S.S.G. § 5K2.12 provides: "If the defendant committed the offense in furtherance of a terroristic action, the court may increase the sentence above the authorized guideline range." Moreover, nothing in the specific Guideline under which Hicks was sentenced—§ 2K1.4, Arson: Property Damage by Use of Explosives—indicates that the Commission already considered terrorist activity in setting the offense level. We conclude that terrorism is a valid basis for departure.

The potential destructiveness of Hicks' conduct also justifies departure in this case. The government's expert witness, whom the district court found credible, testified that if the bomb had detonated as planned, the explosion would have caused a crater approximately thirty to forty feet in diameter and approximately fifteen feet deep. The expert stressed, and the district court found, that the explosion would have probably killed many people in the blocks surrounding the building. Moreover, in the expert's opinion, the bomb would have exploded if the fire department had not been nearby when the initial detonation occurred. According to the district court: "It's only by reason of God's good grace that nobody was injured and nobody was killed.... While [Hicks' counsel] has said, well, the big bomb on the truck that we have been discussing not only did not go off, could not go off, the Court does not agree with the conclusion." These facts, if true, are sufficient to justify departure. Although United States Sentencing Guideline § 2K1.4 contemplates the possibility that the conduct underlying the offense may have put people at risk of bodily harm or even death, there is nothing to indicate that the Commission in setting the offense level took into account the degree of risk that the district court found was present here. *See, e.g., United States v. Kikumura,* 918 F.2d 1084, 1115 (3d Cir.1990) (disagreed with on other grounds by *United*

The court, at the time of sentencing shall state in open court the reasons for its imposition of the particular sentence, and if the sentence—

 . . . . .

(2) [is outside the Guidelines range] ... the specific reason for the imposition of [the great-

er sentence]

*States v. Harrison–Philpot,* 978 F.2d 1520 (9th Cir.1992)).

■ We must next review the district court's factual findings regarding the existence of the aggravating factors. The term "terrorism" does not seem to have a precise definition in the context of the Guidelines. The plain meaning of the term is "the systematic use of terror as a means of coercion." *Webster's Third New International Dictionary* 2361 (1986). The United States Code defines "terrorism" in context completely different than sentencing—that of State Department reporting requirements—as "premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." 22 U.S.C. § 2656f(d)(2). Although Hicks was not a member of an organized group, we conclude that the district court did not clearly err in finding that Hicks' actions constituted "terrorism." Hicks' activities can be seen as the systematic use of violence to further his political goals to effect change in the IRS's policies and practices. In his letter to a local newspaper, Hicks wrote: "As long as the IRS is used to extort such high, unfair and ambiguous taxes ... you and the government agencies can expect to see more of these events and with increasing serverety [sic] with successive events." In a letter to the sentencing judge, Hicks wrote: "Was it worth it? If it benefits our people by bringing attention and correction to the problems referred to above [the perceived unfairness of the IRS], then yes...." Those statements are consistent with the label "terrorism."

■ The district court's findings regarding the potential for destruction likewise are not clearly erroneous. The district court found that the government's expert witness was credible, and implicitly, that Hicks was not. The district court is in the best position to assess the credibility of the witnesses, and we defer to its judgment.

■ Finally, we must consider whether the degree of departure was reasonable.

This court has rejected other circuits' "pure common law approach to reasonableness." *United States v. Streit,* 962 F.2d 894, 903 (9th Cir.) (comparing the Ninth Circuit's approach with that in the Tenth and First Circuits as set forth in *United States v. Bernhardt,* 905 F.2d 343, 346 (10th Cir.1990) and *United States v. Ocasio,* 914 F.2d 330, 337 (1st Cir.1990)), *cert. denied,* — U.S. ——, 113 S.Ct. 431, 121 L.Ed.2d 352 (1992). Instead, as *Lira–Barraza* made clear, the district court must determine the extent of departure with regard to the structure, standards and policies of the Act and Guidelines. Moreover, in order to facilitate appellate review, the district court must explain in detail the reasons behind the imposition of a particular sentence, analogizing to other Guidelines provisions. "If the district court fails to articulate reasons for *the extent* of departure or if the analogy is not reasonable, [the panel on appellate review] must vacate and remand." *Streit,* 962 F.2d at 903. Here, the district court provided no explanation whatsoever for the extent of departure; instead, it simply imposed the statutory maximum. Under *Lira–Barraza,* this is reversible error. The sentence must thus be vacated and the case remanded.

## IV

■ We next consider Hicks' argument that the district court improperly ordered the sentence imposed on Count 1 of the Fresno indictment to run consecutive to Count 1 of the Los Angeles indictment.[3] According to Hicks, the Sentencing Guidelines prohibit consecutive sentences under these circumstances. Instead, Hicks contends that the sentences must be concurrent.

The conduct underlying Count 1 of the Los Angeles indictment was committed in March 1987. The Guidelines apply only to offenses committed after November 1, 1987 and thus do not apply to this count. *See* U.S.S.G., *Guidelines Manual* 1 (1991). The Guidelines do apply to Count 1 of the Fresno indict-

---

**3.** As noted in Part A, *supra,* the court stated in open court at sentencing that the sentence imposed on Count 1 of the Fresno indictment was to run *concurrent to* that imposed on Counts 6

and 11 of the Los Angeles indictment. Thus, the sentence imposed on Count 1 of the Fresno indictment *did not* increase Hicks' term of incarceration.

ment. Thus, the issue here is whether the Guidelines constrain the power of the district court to make a sentence imposed on a Guidelines count consecutive to, instead of concurrent with, a pre-Guidelines count.

"Even though the guidelines generally eschew consecutive sentences except where necessary to implement the applicable guideline range, *see* §§ 5G1.2(c) and (d), 'nothing in the guidelines or the Sentencing Reform Act precludes the court from ordering that a sentence imposed on a pre-guidelines count be served consecutively to a sentence imposed on a guidelines count.'" *United States v. Ewings,* 936 F.2d 903, 910 (7th Cir.1991) (quoting *United States v. Watford,* 894 F.2d 665, 669 (4th Cir.1990)). We therefore conclude, along with every other circuit that has addressed this question, that the district court had the discretion to make the defendant's Guidelines and pre-Guidelines counts consecutive. *See, e.g., Ewings,* 936 F.2d at 909; *United States v. Lincoln,* 925 F.2d 255, 256–57 (8th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2838, 115 L.Ed.2d 1006 (1991); *United States v. Parks,* 924 F.2d 68, 72–74 (5th Cir.1991); *United States v. Watford,* 894 F.2d 665, 669 (4th Cir.1990). The Guidelines simply have no effect on the district court's treatment of pre-Guidelines counts.

## V

■ We finally consider Hicks' argument that the district court improperly included the cost of psychological counseling for IRS employees in its restitution order.[4]

The government argues that Hicks waived this argument because he failed to raise it before the district court. However, the record belies this contention. In a discussion about whether restitution was proper, Hicks' counsel stated: "If there had been physical damage to the persons, if they had bodily injury, if they were hit by something ... then I believe ... that medical costs should be covered." The argument was not waived.

"A federal court has no inherent power to order restitution." *United States v. Casamento,* 887 F.2d 1141, 1177 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *accord United States v. Keith,* 754 F.2d 1388, 1391 (9th Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985); *United States v. Elkin,* 731 F.2d 1005, 1010 (2d Cir.), *cert. denied,* 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984). "The court's otherwise broad discretion to determine the punishment to be imposed on a defendant is circumscribed by the sentencing limitations imposed by statute." *Elkin,* 731 F.2d at 1010. The source of the court's power to order restitution is 18 U.S.C. § 3663.

Section 3663(b) specifies precisely to whom and for what restitution may be ordered. It provides in relevant part:

(b) The [restitution] order may require that [the] defendant—

. . . . .

(2) in the case of an offense resulting in bodily injury to a victim—

(A) pay an amount equal to the cost of necessary medical and related professional services ... relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing by the law of the place of treatment.

. . . . .

18 U.S.C. § 3663(b)(2)(A). Subsection (b)(2)(A) is the only part of the statute that concerns the cost of counseling.[5] Subsection (b)(1), which concerns restitution for property damages, contains no such authorization. Thus, section 3663 specifically authorizes the inclusion of the cost of counseling *only* where the victim has suffered a *physical* injury in addition to the emotional injury giving rise to the need for counseling.

The government argues that section 3663(b) should not be read as an exclusive catalog of losses that may be included in a restitution order. However, the government

---

4. Hicks does not challenge any other component of the restitution order.

5. Subsection (b)(1) concerns restitution for property damage; (b)(3) concerns funeral costs; and (b)(4) allows restitution in the form of services if the victim consents.

fails to point to an alternate statutory source for the authority to award restitution under these circumstances. At a glance, it might appear that 18 U.S.C. § 3664 provides the needed authorization. Section 3664(a) provides that "[t]he court, in determining whether to order restitution under section [3663] [6] and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense." Arguably, this section can be interpreted as allowing restitution for *all* losses caused to the victims. The Supreme Court, however, in *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990), implicitly foreclosed the argument that section 3664 authorizes restitution for a broader class of expenses than specified in section 3663. In holding that the award of restitution must be limited to losses caused by offenses for which the defendant was convicted, the Court reasoned:

> [T]he detailed substantive guidance regarding the calculation of restitution that is found in subsections (b)(1), (b)(2), and (b)(3) makes clear that [section 3663] does more than simply designate *who* is entitled to restitution under the Act; those provisions establish the *amount* of restitution that courts can award for various losses caused by the offense.
>
> ... [I]t would be anomalous to regard [section 3664] which delineates "[p]rocedures for issuing order[s] of restitution," rather than [section 3663], which governs the court's authority to issue restitution order, as fixing the substantive boundaries of such orders.

*Id.* 495 U.S. at 418, 110 S.Ct. at 1983 (emphasis in original). Thus, the Court made clear that the boundaries of a court's power to order restitution are defined by section 3663. *See also United States v. Husky*, 924 F.2d 223, 226 (11th Cir.) ("Our research uncovered no cases ... which suggest that the list of compensable expenses in the restitution statute is anything other than exclusive.

The language of the statute itself suggests that the list is exclusive."), *cert. denied,* —— U.S. ——, 112 S.Ct. 111, 116 L.Ed.2d 81 (1991).

The government cites *United States v. Keith,* 754 F.2d 1388, 1393 (9th Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985), for the proposition that section 3663 allows a court to award restitution for losses not specified in the statute. In *Keith,* the defendant was convicted of assault with intent to rape. The victim had suffered bodily harm. The court awarded restitution for the cost of the victim's air fare for a visit to her family. Rather than concluding that section 3663 was not exclusive, however, the court held that the air fare fell within a recognized category in the restitution statute: non-medical care and treatment. The court found that "[a] sentencing judge could properly find that the support and comfort of the family are important elements in the care and treatment of the psychological trauma caused by the kind of assault that resulted in [the defendant's] conviction." Thus, in contrast to the government's reading of the case, the court took pains to fit the restitution order into the language of the statute.

■ In short, a court may only award restitution for the categories enumerated in section 3663. The cost of psychological counseling can be included in a restitution order only when the victim has suffered physical injury. Here, no IRS employee suffered physical injury. Thus, the inclusion of the cost of counseling in the restitution order was erroneous.[7]

## VI

To summarize, the district court did not abuse its discretion in ordering the sentence imposed on the pre-Guidelines count and the Guidelines count to run consecutively. Nor did the district court err in concluding that the terroristic nature and the potential de-

---

6. The section to which the statute refers has been renumbered.

7. At oral argument, the government noted that in addition to the cost of counseling, the $335,805 restitution figure included $59,850 for lost pro-

ductivity. The government concedes that ordering restitution for lost productivity was improper. Thus, in resentencing Hicks on remand, the district court is instructed not to include the $59,850 in the restitution order.

structiveness of Hicks' behavior warranted departure from the Guidelines range. However, we must vacate the sentence and remand to the district court to provide an explanation for the extent of the departure and to recalculate the amount of the restitution ordered.

VACATED and REMANDED for resentencing.